**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SCOTT HAYMER | ) | |
| 8110 Forestdale Drive | ) | |
| Kirtland, Ohio 44094 | ) | |
| | ) | |
| and | ) | No. |
| | ) | |
| MICHON HAYMER | ) | Judge |
| 8110 Forestdale Drive | ) | |
| Kirtland, Ohio 44094 | ) | **VERIFIED CLASS-ACTION** |
| | ) | **COMPLAINT** |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF WILLOUGHBY, OHIO | ) | |
| 1 East Spaulding Street | ) | |
| Willoughby, Ohio 44094 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| GERRY MERHAR | ) | |
| 1 East Spaulding Street | ) | |
| Willoughby, Ohio 44094 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ROBERT FIALA | ) | |
| 1 East Spaulding Street | ) | |
| Willoughby, Ohio 44094 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| KEN KARY | ) | |
| 1 East Spaulding Street | ) | |
| Willoughby, Ohio 44094 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| KIRTLAND COUNTRY CLUB | ) | |
| 39438 Kirtland Road | ) | |
| Willoughby, Ohio 44094 | ) | |
| | ) | |

and                                         )
                                            )
THE KIRTLAND COUNTRY CLUB CO.               )
39439 Kirtland Road                         )
Willoughby, Ohio 44094                      )
                                            )
and                                         )
                                            )
JOHN DOES 1–100,                            )
addresses presently unknown,                )
                                            )
        Defendants.                         )

## INTRODUCTION

*A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.*

U.S. Const. amend. II.

1.      Plaintiffs' class-action lawsuit is *not* an assault on the Second Amendment. It merely seeks relief from constitutionally protected shooting that resulted in the constant, intolerable, and debilitating noise enabled by the city of Willoughby and its planning committee and caused by Kirtland Country Club's shooting range abutting Plaintiffs' and class members' neighborhood.

2.      Beginning in 2015 (and operating from November through March), high-decibel shotgun blasts from this range have plagued Plaintiffs and class members.

3.      By their lawsuit, Plaintiffs seek damages, declaratory relief, and an order enjoining Defendants' shooting or, alternatively, repatterning or moving Defendants' range sufficient to stem its destructive effect on them.

## PARTIES

4.      Plaintiffs are individuals who reside at 8110 Forestdale Drive Kirtland, Ohio 44094.

5.      Defendant city of Willoughby, Ohio ("Willoughby") is an Ohio city, maintaining

2

its city hall at 1 E. Spaulding Street, Willoughby, Ohio 44094.

6.     At all times relevant to Plaintiffs' Complaint, Defendant Gerry Merhar was chair of the Willoughby Planning Commission that approved KCC's conditional use permit ("CUP") and meets at 1 E. Spaulding Street, Willoughby, Ohio 44094.

7.     At all times relevant to Plaintiffs' Complaint, Defendant Robert Fiala was a member of Willoughby's Planning Commission that approved KCC's CUP and meets at 1 E. Spaulding Street, Willoughby, Ohio 44094.

8.     At all times relevant to Plaintiffs' Complaint, Defendant Ken Kary was a member of Willoughby's Planning Commission that approved KCC's CUP and meets at 1 E. Spaulding Street, Willoughby, Ohio 44094.

9.     Defendant Kirtland Country Club is a private country club and business located at 39438 Kirtland Road, Willoughby, Ohio 44094.

10.     Defendant The Kirtland Country Club Co. is a nonprofit corporation located at 39439 Kirtland Road, Willoughby, Ohio 44094.

11.     Defendants Kirtland Country Club and The Kirtland Country Club Co. are referred to collectively herein as "KCC."

12.     Defendant John Does 1–100 are skeet shooters at KCC whose names are not presently discoverable to Plaintiff. Following discovery, Plaintiffs will move for leave to amend their complaint to name these shooters according to Fed. R. Civ. P. 15(d).

## JURISDICTION AND VENUE

13.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 2201 for Plaintiffs' federal claims under 42 U.S.C. §§ 1983, 1985, and 1988. Section 1988 provides for attorneys' fees as part of the costs and experts' expenses. This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367.

14.     This Court has personal jurisdiction over Defendants because they are Ohio residents or are otherwise located or headquartered in Ohio, they caused tortious injury by an act or acts performed in Ohio, and they have an interest in, use, or possess real property in Ohio. As such, the exercise of personal jurisdiction over Defendants comports with the requirements of due process.

15.     Venue is proper in this Court under 28 U.S.C. § 1391 because the parties reside in this district and all Defendants are Ohio residents, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district, and a substantial part of the property that is the subject of Plaintiffs' action is in this district.

## FACTUAL ALLEGATIONS

**A.      Willoughby's Planning Commission deprived Plaintiffs and class members of property interests without procedural due process in violation of the Fourteenth Amendment.**

16.     At all relevant times, Willoughby's Planning Commission consisted of co-conspirators Chairman Gerry Merhar[1], Robert Fiala, and Ken Kary.

---

[1] Chairman Merhar is an insurance agent who for several years has sold multiple lines of insurance coverage to and represents KCC members and profits considerably therefrom. Also, his family has benefited financially from decades of business relationships with KCC members.

17.     By approving, effectuating, and implementing, KCC's CUP, Chairman Merhar, Fiala, and Kary and are jointly and severally responsible along with Willoughby for all aspects and results of Willoughby's procedural due process violations for their doing or having caused to be done the following acts in furtherance of the object of a conspiracy to issue KCC's CUP, which issuance injured Plaintiffs and class members in their person or property or deprived them of having and exercising certain rights or privileges of United States citizens.

18.     On July 9, 2015, Willoughby held a public hearing on KCC's CUP. Before this hearing, Willoughby sent notice of the hearing—notice implemented, facilitated, and approved by Chairman Merhar, Fiala, and Kary—only to homes within a mere 100 yards of KCC.

19.     Notably, Willoughby, in an omission implemented, facilitated, and approved by Chairman Merhar, Fiala, and Kary, did *not* send notice (or sent inadequate notice) of the hearing (or subsequent meetings) to the homes in the shooting range's intended line of fire—namely, those people whom the shooting was certain to affect and terrorize.

20.     Neither Willoughby, Chairman Merhar, Fiala, nor Kary sent notice (or sent inadequate notice) to these essential people because KCC did not want them to attend the public hearing (or subsequent meetings) and object to the CUP's eventual issuance. KCC's influence over Willoughby's, Chairman Merhar's, Fiala's, and Kary's acts or omissions is evident from the absence of objectors, which facilitated Willoughby granting KCC's CUP.

21.     At the hearing, KCC expressed its interest in moving the shooting range from its previous, more remote location, closer to KCC's clubhouse. This move, made strictly for shooters' convenience, would have placed the range within 1,000 yards of 75 homes and within one mile of 300 homes, including Plaintiffs'.

5

22.     At the hearing, was former longtime Waite Hill mayor (and former KCC president) Arthur Baldwin

23.      on behalf of KCC. He insisted residents living less than a half-mile from the range would not hear the shotgun blasts and promised KCC would only allow shooting on Sunday afternoons to avoid disturbing the Mormon church located one mile away on Kirtland Road.

24.     But Willoughby ignored the obvious question Baldwin's concession evoked: if the shooting was not disruptive and could not be heard less than a half-mile away, how could it be disruptive one mile away at the Mormon Church?

25.     This same duplicitous logic led KCC officials to carefully schedule KCC's proposed skeet-shooting season from November to March (shooting that involved shotgun blasts KCC insisted were neither disruptive nor traumatic) because KCC did not want the noise it claimed didn't exist to affect its golfers, swimmers, tennis players, and diners during the spring, summer, and fall months.

26.     Baldwin also said at the hearing that KCC conducted its own random noise level tests at three sites on February 21 and February 22. These tests consisted of the Willoughby mayor and police chief driving to the sites and receiving text notifications that the shots were coming. Baldwin insisted the mayor couldn't hear any noise from Sherwin Road, which adjoins KCC, or I-90.

27.     At the regular meeting following the July 9, 2015 public hearing, planning commission member Greg Patt challenged the other planning commission members' approach to noise testing attendant to issuing KCC's CUP, questioning whether any way existed to abate the sound from a shotgun blast and insisting that any test conducted cannot be subjective.

28.     Cox recognized that sending people out to hear tests was not very scientific.

29.     Cox conceded that the planning commission had endorsed, commission, approved, or embraced a completely subjective test, Chairman Merhar adding that this subjective test was the only test available, though it wasn't.

30.     Patt countered that a subjective test meant the planning commission hadn't done its job properly.

31.     Finally, Kary reluctantly recognized the need to protect and cover the planning commission by commissioning a more scientific test yet never suggested this alternative test would be properly administered or overseen, which it wasn't.

32.     During a July 23, 2015, planning commission meeting, Willoughby, through its planning commission populated and managed by Chairman Merhar, Fiala, and Kary, approved KCC's CUP.

33.      As occurred with respect to the hearing, Willoughby, in an omission implemented, facilitated, and approved by Chairman Merhar, Fiala, and Kary, failed to send notice (or sent inadequate notice) of the meeting to Plaintiffs and class members.

34.     This failure to send notice or the issuance of adequate notice again denied Plaintiffs and class members the opportunity to voice their opposition to KCC's CUP. Indeed, had Willoughby issued adequate notice, Plaintiffs and class members would surely have objected—a circumstance KCC did not desire.

35.     To the extent anyone affected attended the meeting, Willoughby's Planning Commission denied Plaintiffs and class members the right to be heard, Chairman Merhar announcing if they "missed the previous one concerning KCC, [they] cannot be heard tonight."

36.     A fundamental requirement of due process in any proceeding to be accorded finality is notice reasonably calculated under all the circumstances to apprise interested parties of the

pendency of the action to afford them an opportunity to present their objections. But Willoughby, in cooperation and coordination with KCC, failed to provide notice or provided inadequate notice to Plaintiffs and class members.

37.     Willoughby's lack of or inadequate notice occurred despite Willoughby knowing the names and addresses of everyone whom KCC's shooting range would affect and having the means to notify these people whether by mailbox flyer, phone call, email, text message, or otherwise. Willoughby could even have posted information about the hearing and meeting at churches, schools, local Starbucks, and elsewhere but, based on information and belief, it didn't.

38.     In this manner, Willoughby, in cooperation and coordination with KCC, chose not to notify Plaintiffs and class members of the hearing and meeting in a manner reasonably calculated under the circumstances to apprise them (as interested parties) of the pendency of Willoughby's impending action and afford them an opportunity to present their objections.

39.     The shotgun blasts' intense and harmful decibel levels directly and adversely affect Plaintiffs and class members because KCC and the John Doe Defendants unnecessarily shoot to the south toward Kirtland.

40.     Plaintiffs and class members have a property right known as an intangible interest in their premises—namely, the right to safe, sound, and secure homes, free from terrorizing, incessant, and unnecessary shotgun blasts. Willoughby's lack of (or insufficient) notice of the hearing and meeting deprived Plaintiff and class members of due process concerning Defendants' evisceration of this property right.

**B.     KCC's and the John Doe Defendants' incessant shooting terrorizes Plaintiffs and class members.**

41.     During a July 14, 2016, regular meeting, Chairman Merhar praised KCC despite its failure to make earlier-promised alterations to the range to abate the harmful decibel levels from the shotgun blasts, claiming, "other than the noise issue, you have bent over backwards to conform with the conditions that the use permit was given with."

42.     This was a stunningly insensitive and biased insider remark, considering the "noise issue" traumatized Plaintiffs and class members for ten hours per weekend from November through March and considering Chairman Merhar was well aware that KCC operated its shooting range only in winter because it didn't want the shotgun blasts it disingenuously insisted were not disruptive or traumatic to disturb its golfers, swimmers, tennis players, and diners during the spring, summer and fall.

43.     During his September 5, 2019, deposition in *End the Noise, Inc. v. Kirtland Country Club Co.*,[2] KCC's general manager, Mark Petzing, admitted to KCC's insensitivity:

> Q: Why isn't shooting done during the summer?
>
> A: Because we don't want it going on, you know – because of the shot [*sic*] with golf going on.

Exhibit A at 85:19–21.

44.     Plaintiffs and class members craved for the shooting to occur in any direction but theirs, and Petzing added that KCC's assault on them need never have happened:

---

[2] No. 2019 CV 000504, Lake Cty. Ct. Common Pleas.

Q: So what was the direction required by the city planning commission?

A: There was no direct requirement.

*Id.* at 137:11–14.

45.    Chairman Merhar's words and actions during the CUP approval process and afterward showed a deliberate indifference to Plaintiffs and class members affected by KCC's and the John Doe Defendants' shotgun blasts and demonstrated decision-making in cooperation and coordination with KCC.

46.    All told, Willoughby's actions before, during, and after the July 23, 2015, meeting displayed and continue to display a lack of procedural due process that resulted in KCC obtaining and maintaining its CUP.

47.    Willoughby's and KCC's conduct demonstrates such a close nexus between Willoughby and KCC's challenged action that KCC's seemingly private behavior may be fairly treated as Willoughby's.

**C.    KCC's decibel testing, which Willoughby (in cooperation and coordination with KCC) accepted as true, was fraudulent, which fraud was or should have been evident to Willoughby and KCC and which drove Willoughby's approval of KCC's CUP.**

48.    When approving KCC's CUP during the July 23, 2015, meeting, Willoughby's Planning Commission, in cooperation and coordination with KCC, accepted without inquiry, examination, or independent scrutiny scientifically impossible decibel-testing results

49.    The results, produced by KCC's environmental consultant HzW presented matching decibel levels from three sites within 2,500 feet of KCC's shooting range: a 50.6 decibel level *before* the shotgun blasts, and a 50.6 decibel level *during* the shotgun blasts. Exhibit B (HzW report 1). The unbelievability of these results was or should have been evident to Willoughby, but it ignored their unbelievability as part of its cooperation and coordination with KCC.

10

50.     When applying for (then receiving and maintaining possession of) its CUP, KCC presented to Willoughby fraudulent and wildly inaccurate low-decibel results gathered through improper testing methodology. KCC did this to objectively mislead Plaintiffs and any class members who might have learned of the meeting and to give Willoughby the cover necessary to grant the CUP.

51.     Despite the patent absurdity of these results—results that encouraged Willoughby's approval of KCC's CUP—Chairman Merhar had "no further questions" of KCC.

52.     When approving the CUP, Willoughby's Planning Commission strayed from its previous practice of issuing one-year terms for CUPs concerning venues with potential for noise violations, including two amended CUPs issued to Lure Bistro in 2013 and 2014.

53.     Instead, a member of Willoughby's Planning Commission can be heard on the audio recording of the July 23, 2015, meeting avoiding the words "expire" and "renew" and instead using the word "review" on the CUP.

54.     This verb choice resulted in the perpetual longevity of KCC's CUP, which endurance the Planning Commission had not previously permitted and which sprung exclusively from the cooperation and coordination between Willoughby and KCC in a manner Plaintiffs and class members were helpless to challenge.

55.     Petzing admitted in a July 15, 2016, e-mail to Chairman Merhar that even *he* believed the CUP's had a one-year duration, writing, "I recognize that the expiration is 5 days prior to the next meeting; for which this subject was tabled. As such, I am requesting an extension of the CUP until at least the July 28 meeting." Exhibit C.

11

56.     Chairman Merhar immediately forwarded Petzing's e-mail to Boards and Commissions Secretary Vicki Grinstead, commenting, "I don't believe that the expiration date has any relevance, since CUPs are permanent and not renewed annually." *Id.*

57.     Not only did Chairman Merhar's comment contradict the Planning Commission's precedent of issuing only one-year CUPS, but also it conflicted with his comments at an October 20, 2016, special meeting where he confessed, "I believe at the time that Betty [Nardelli] issued a letter to the club which stated that this was temporary. I have not seen that letter, but I believe that Betty said she issued a letter to that effect." Exhibit D.

58.     So when Chairman Merhar emailed Boards and Commissions Secretary Vicki Grinstead and commented, "I don't believe that the expiration date has any relevance, since CUPs are permanent and not renewed annually," Exhibit C, his remarks easily contradicted the Planning Commission's precedent of issuing one-year CUPs, displaying Willoughby's cooperation and coordination with KCC.

59.     In 2016, following the first season of shooting and multiple and persistent pleas from residents traumatized by the ceaseless shotgun blasts, Willoughby's Planning Commission again accepted KCC's inaccurate noise-level testing results.

60.     For this test, HzW expanded its testing to twelve sites in close proximity to the range yet maintained its faulty testing methodology that yielded inaccurate and intentionally misleading results.

61.     According to the 2016 results, the decibel level did not top 72.6 decibels at any of the sites at any time. What's more, at two of the sites within 2,500 feet of the range the report professed the noise level rose only *two decibels* during shooting.

62.     HzW even claimed, "noise levels associated with cars driving on the roads, when no shooting activities were performed, ranged from 63.9 to 72.1 decibels." Exhibit E at 4.

63.     But according to leading audio engineer and decibel expert Will Thornton, http://www.acoustics-vibrations.com/Qualifications.aspx, none of HzW's tests had "sufficient accuracy, nor frequency response, to accurately characterize Impulse noise emitted by gunfire." Exhibit F at 11.

64.     Had HzW measured the gun noise emissions using the correct methodology and metrics (and had Willoughby insisted on even modest accountability for the test results KCC commissioned), "it would have been apparent that the gun noise is much louder, on the order of as much as 32 times louder than reported by HzW." *Id.* at 19.

65.     Thornton reviewed HzW's 2016 test results and observed that HzW designed its recommendations "to address continuous and steady-state noise (including intermittent continuous noise) and [the results did] not address the highly specialized problem of Impulse Community Noise." *Id.* at 13.

66.     Thornton also reviewed HzW's 2019 test result and found the methodology in that test—a survey grade (Type 2) SLM—did "not have sufficient accuracy, nor frequency response, to accurately characterize Impulse noise emitted by gunfire." *Id.* at 11.

67.     Had HzW measured the gun noise emissions using the correct methodology and metrics, "it would have been apparent that the gun noise is much louder, on the order of as much as 32 times louder than reported by HzW." *Id.* at 19.

68.     According to Thornton, the use of the wrong metric will distort the measured results leading to erroneous conclusions.

69. For example, "impulsive noises (characterized by short durations and high levels) must be measured with metrics that have sufficiently short time-averaging properties to characterize the levels in a way that can be meaningfully compared to the human perception of loudness." *Id.* at 4.

70. Accordingly, "impulsive sounds such as firearms noise must be characterized using the Peak sound pressure. The Peak sound pressure level is the instantaneous (no time averaging) maximum sound level occurring over some arbitrary time interval." *Id.*

71. Consistent with this, Thornton conducted tests at five adjacent locations using the Peak sound pressure and found gunfire from KCC's range produced sound levels throughout the community on the order of 88–104 dB(A). He also found the gun noise exceeded the ambient sound level by 34–64 dB(A). *Id.* at 21.

72. Thornton's testing methodologies indicate that "every shot fired at the Club range creates Impulse noise throughout the community and subjects every resident within an area of more than 4.75 square miles to Peak sound levels of 93 dBA or greater." *Id.* at 47.

**D. Though the CUP cosmetically requires noise-abatement procedures, KCC refuses to make any, and Willoughby, in cooperation and coordination with KCC, neither monitors KCC nor requires KCC to adopt any such procedures.**

73. Willoughby has shown a deliberate indifference to Plaintiffs and class members by failing to inspect KCC's shooting range.

74. Condition 7 of the CUP explains that the noise "be directed south toward Kirtland and away from Tudors Estates (in Willoughby)." Exhibit G.

75. Condition 7 requires KCC to direct south by a berm the noise from the range, but no berm exists. All that exists behind the range is a small bank of grass of inconsistent height, none

greater than five feet that does not stretch around the entire rear perimeter on the range's north side.

76.     And although the Willoughby Building Department must issue a permit for the installation of a berm (and despite department records showing sixteen permits obtained by KCC for various projects over the past eight years), KCC has never sought a permit to install a berm related to shooting, and Willoughby has neither required KCC to obtain a permit nor comply with condition 7 because of its continuing cooperation and coordination with KCC.

77.     When asked at his deposition about KCC's noncompliance, Petzing agreed that KCC never installed a berm to protect Plaintiffs and class members, which neglect violated condition 7:

> Q: Do you have any evidence of when the berm was actually built?
>
> A: Not off the top of my head.
>
> Q: And we have nothing to show that it was actually built before shooting started?
>
> A: I would have to imagine we did, but not right in front of me right now I don't.

Exhibit A at 103:1–7.

78.     And when asked about the alterations KCC president Frank Floyd professed to promise during the July 26, 2016, and August 25, 2016, planning commission meetings, Petzing confessed that KCC never made those either:

> Q: Did you put a pavilion top over top?
>
> A: We did not.
>
> Q: Why not?
>
> A: Because we didn't.

15

*Id.* at 111:10–13.

79.     Willoughby's former building inspector, Darryl Keller, was required to monitor KCC's range, yet because of Willoughby's continuing cooperation and coordination with KCC he failed to inspect it to ensure substantial compliance with the CUP's conditions and Ohio's noise and safety standards.

80.     But due diligence required Keller to inspect the range to ensure an efficient berm was in place and proper shotgun gauges and skeet shells were being used, especially following complaints by area residents that the shotgun blasts seemed to be getting louder each season. No record exists of Keller ever inspecting the range, which absence stands to reason considering Willoughby's cooperation and coordination with KCC.

81.     During his September 5, 2019, deposition, Petzing admitted Willoughby was complicit with KCC before 2019 in failing to determine whether KCC was abiding by the CUP conditions:

> Q: Has the city ever contacted the club to see if it was abiding by the Conditional Use Permit any time prior to 2019?
>
> A: I don't know when—I got Darryl's letter, but if that was before 2019, then no.

*Id.* at 206:7–12.

82.     Willoughby's repeated and perpetual failure to ensure KCC's compliance with the CUP, which CUP sprung from the meetings for which Willoughby unconstitutionally failed to provide Plaintiffs and class members notice or adequate notice, constituted a similarly or relatedly unconstitutional custom or practice that Willoughby exercised repeatedly, customarily, and with prevalence.

16

**E.     Ohio law concerning the decibel ceiling at shooting ranges is void and meaningless.**

83.     Ohio Revised Code § 1533.84 tasks the chief of the Division of Wildlife with establishing standards for shooting ranges in Ohio.

84.     This statute requires that the rules "shall be no more stringent than national rifle association standards, and include standards for the limitation and suppression of noise, standards for the hours of operation of shooting ranges of the various types and at the various locations of ranges, and standards for public safety." *Id*.

85.     The noise rules that apply to shooting ranges are found in Ohio Adm. Code 1501:31-29-03, which provides, in part, that "the sound level [may not] exceed[] ninety decibels dB(A) for one hour out of twenty-four hours or eighty-five decibels dB(A) for eight hours out of twenty-four hours and the sound measuring receiver is located at the boundaries of the range property."

86.     But the OAC was inherently flawed from its onset. The legislative body that enacted the ORC and provided power to the chief did not understand the severity of a ninety-decibel ceiling or the random methodologies that would be used to test it.

87.     Even Senator Terry Johnson, who sponsored the bill that became O.R.C. § 1533.84, admitted he had no understanding of what a ninety-decibel ceiling meant and expressed surprise that a shooting range was placed in the densely populated area that surrounds KCC.

88.     So in 2016, the Court of Appeals of Ohio for the Sixth Appellate District, in *Szuch v. FirstEnergy Nuclear Operating Co.*, 2016-Ohio-620, unanimously eviscerated the ninety-decibel ceiling.

89.     The court explained the ceiling was meaningless because the methodologies used to test the decibel levels at a shooting range cannot properly measure the intermittent blasts.

17

Whether tested continuously or cumulatively, ambient noise obscures the peak sounds of the intermittent blasts, meaning a shooting range can "never violate the noise regulations." *Id.* ¶ 24–25.

90.     Thornton shared *Szuch's* observation when describing the O.A.C.'s unattainable testing requirement: 720,000 shotgun blasts in one hour (an unrealistic volume of shooting) is required to exceed the state's ninety-decibel ceiling. Exhibit F at 10.

91.     Based on consensus scientific testing standards, Thornton determined that "every shot fired at the Club range creates Impulse noise throughout the community and subjects every resident within an area of more than 4.75 square miles to Peak sound levels of ninety-three decibels or greater." *Id.* at 47.

92.     Considered in more accessible terms, the O.A.C.'s requirement is akin to setting 300 mph speed limit in a school zone. Because no vehicle can travel from 0 to 300 in one block, the speed limit is unreachable, meaning this hypothetical statute (like the O.A.C.) would provide only fabricated or illusory guidance.

93.     The *Szuch* court determined FirstEnergy's shooting range did not substantially comply with the Code's standard. This created "an area of opportunity for the Chief of the Division of Wildlife to promulgate rules which would lend greater clarity to the standard, and the means by which the sound can be measured to test compliance with that standard." *Szuch*, 2016-Ohio-620 at ¶ 27.

94.     Though *Szuch* was issued almost eight years ago, Chief Kendra Wecker has not acted. Her reluctance to propose a new methodology is presumably because she realizes it is impossible to devise a uniform decibel standard as every situation is different.

95. Absent controlling and unifying state law, local ordinances trigger. *See* Ohio Constitution, Article XVIII, § 3—the Home Rule Amendment ("Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws.").

96. Notably, the Chief oversees eighteen shooting ranges in Ohio. All are located in nonresidential, rural areas (e.g., parks or wildlife areas); none are based in townships or municipalities with antigun ordinances.

97. Furthermore, of the approximately 110 private shooting ranges Plaintiffs' counsel have identified, only 11 are in municipalities with antigun ordinances.

98. This means 100 percent of the Ohio shooting ranges and more than 90 percent of the private shooting ranges would be unaffected by a law that returned authority to local municipalities.[3]

**F. By choosing not to follow *Szuch* and promulgate rules that would lend greater clarity to the decibel standard, Ohio has created a de facto home rule for shooting range standards.**

99. Because the Chief has chosen not to address the testing methodologies used at shooting ranges, suitable guidance derives from related legislative action. *See* supra ¶ 91.

---

[3] Because many shooting ranges are privately maintained, considerably more than 110 private shooting ranges likely exist most of which would be unaffected by a law that returned authority to local municipalities.

100.    Moreover, on July 1, 2022, Ohio enacted O.R.C. § 3743.45—Ohio's fireworks law, allowing the purchase, possession, and use of consumer-grade fireworks in Ohio. Notably, under O.R.C. § 3743.45(D), a county, township or municipality can opt out of allowing fireworks.

101.    This statute is a shining example of the way the legislature amends state law to restore authority to municipalities. It established a reasonable methodology for allowing citizens to discharge fireworks while recognizing the individuality of each Ohio township and city by offering the right to opt out.

102.    Importantly, legislators did not set a decibel ceiling for fireworks. Instead, they delegated the power to regulate fireworks to counties, townships, and municipalities.

103.    The legislature did this because it recognized each municipality is like a snowflake—unique unto itself. Each Ohio township and city, no matter its size, is distinctive in geography, topography, population, population density, parochial traditions, and interests.

104.    As such, local authorities and residents need to consider multiple factors before a shooting range can arise in their area, including its proximity to hospitals, retirement homes, rehabilitation centers, churches, schools, shopping centers, and critically, residential homes whose occupants might be vulnerable to high-decibel explosion occurrences due to physical and psychological infirmities.

105.    Following *Szuch*, our legislature enacted the fireworks law because it recognized when it comes to decibel levels and disparate populations, one size does not fit all.

106.    Out of the more than 1,200 Ohio townships and cities, fewer than 100 have opted out of allowing fireworks.

107.    Not surprisingly, that small percentage includes the city of Lakewood, which has a population density of 7,683.9 per square mile—the highest in the state.

20

108.    But sparsely populated areas, including the village of Holiday City, which has a population density of 17.1 per square mile (the lowest in the state), have not opted out.

109.    This right to opt out derives from the recognition of municipalities' interest in protecting their citizens from unnecessary harm of the type that is occurring here.

**G.    Under home-rule authority, Willoughby's firearms ordinance controls.**

110.    According to Codified Ordinance of the City of Willoughby, Ohio § 549.08, the Willoughby bans the discharging of any "air gun, rifle, shotgun, revolver, pistol or other firearm" within the corporate limits of the municipality.

111.    *Szuch's* ruling eviscerating Ohio Adm. Code 1501:31-29-03 established home-rule authority (the intent of Senator Johnson) over Ohio shooting ranges.

112.    As it concerned the fireworks law, Kent Scarrett, executive director of the Ohio Municipal League, testified before the General Assembly in April of 2021, addressing HB 172—the bill that became the fireworks law.

113.    Scarrett thanked the members for including home-rule language in the fireworks statute:

> This legislation would allow consumers to purchase and use consumer grade fireworks while respecting the rights of municipal Home Rule authority to restrict or ban the use of fireworks within a municipality's jurisdiction.
>
> We appreciate the care Rep. Baldridge and Rep. O'Brien have taken to respect municipal Home Rule authority in HB 172. The legislation ensures municipal officials are able to make the best decision for their own local community with respect to consumer grade fireworks.

Exhibit H.

114.    Scarrett recognized and appreciated that local governments were best suited to decide whether their municipalities could handle high-decibel explosion occurrences.

21

115.    Influencing the legislature was the testimony of residents like Sarah Tackett of Springfield, who testified on behalf of those who would be harmed by high-decibel explosions, including children and adults with autism, veterans with PTSD, and animals.

116.    So the solution for shooting ranges is simple and evident. As expressed in O.R.C. § 3743.45, give local leaders and residents the right to determine their own destiny, including here, where according to Willoughby law (and in the absence of Ohio law), no shooting is permitted.

117.    And importantly, establishing home-rule authority would not affect the vast majority of Ohio shooting ranges as their rural locations would make opting out unnecessary. Alternatively, many shooting ranges could simply relocate or implement noise-abatement measures.

**H.     Other shooting ranges employ simple safeguards to protect their neighbors' safety and sanity.**

118.    Butler County Sportsmen Rifle and Pistol Club in Hamilton, Ohio, provides an effective example of how shooting range members can be good neighbors and adapt to mitigate harm done to nearby residents.

119.    The Butler club has been operating for almost 100 years, and the densely populated surrounding area of homes, including directly behind the range, has grown significantly over that time.

120.    Five years ago, the Butler club added fifty-foot steel walls along the sides of the landing area, raising the berm eight feet (while adding steel plates to the top of the berm to increase its height to twenty feet), and installed a new roof.

121.    KCC has done nothing like this but instead continues to terrorize Plaintiffs and class members with excessive decibel levels while lying that it isn't.

122.    KCC has ignored years of Plaintiffs' and class members' public and emotional cries for relief—instead, showing no compassion for the trauma caused by eight seasons of shotgun blasts.

123.    In fact, before the spring of 2019, residents dipped into their life savings and offered KCC $30,000 toward purchasing land in a nearby rural area for the development of a new skeet shooting range that would no longer harmfully and traumatically affect them. KCC rejected their offer.

**I.    Ohio shooting ranges that don't substantially comply with the O.A.C. are not entitled to statutory immunity.**

124.    Ohio shooting ranges are provided statutory immunity under O.R.C. § 1533.85(A)(1), which states, "(t)he owner, operator, or user of a shooting range is not liable in damages in a civil action to any person for harm that allegedly is caused by the creation of noise at the shooting range or the failure to limit or suppress noise at the shooting range if the owner, operator, or user substantially complies with the chief's noise rules."

125.    But O.R.C. § 1533.85(A)(2)(d) also states "(d)ivision (A) of this section does not confer an immunity from civil liability in relation to an owner's, operator's, or user's actions or omissions that constitute negligence, *willful or wanton misconduct, or intentionally tortious conduct if those actions or omissions are not the subject of the chief's noise rules or are not in substantial compliance with the chief's noise rules*." (Emphasis added)

126.    Because the *Szuch* Court found FirstEnergy could not substantially comply with the O.R.C.'s standards, it ruled the range was not entitled to statutory immunity as to noise and safety nuisance claims.

127.    Likewise, in *Battelle Memorial Institute v. Big Darby Creek Shooting Range*, 192 Ohio App. 3d 287 (12th Dist. 2011), the court held immunity protects the owner or operator of a shooting range only "if the court determines that the owner's or operator's actions or omissions that are the subject of a complaint *substantially complied* with the chief's *noise rules* or the chief's *public safety rules*, whichever apply to the nuisance action." *Id.* at 291 (emphasis added).

128.    Like First Energy in *Szuch*, KCC failed to substantially comply with the O.A.C.'s (eviscerated) noise standard. Instead, KCC relied on and embraced methodologies employed during various tests that inaccurately measured decibel levels to disingenuously secure and maintain its CUP. For these reasons, this Court should deny KCC statutory immunity.

129.    Willoughby, Chairman Merhar, Fiala, and Kary were complicit in this noncompliance by failing to demand noise-level tests that would not result in absurdly low decibel levels as measured during actual shotgun blasts, thereby denying Plaintiff and class members of procedural due process.

**J.    Defendants' unnecessary behavior has had debilitating effects on real people—effects Defendants have ignored.**

130.    Some of KCC's victims are military veterans, several of whom prepared a testimonial video they shared with KCC members, including John Does 1–100, in which they pleaded for the shooting to stop: https://youtu.be/63muTL86wSY.

131.    After watching this video, club officials agreed to meet with these veterans to gauge the authenticity of their allegations. In the spring of 2021, Plaintiff, Scott Haymer, and class member Bart Williams escorted club officials to meet five veterans in their homes, including Vietnam veteran and class member Rick Cole.

132.    Cole explained to the effect shooting had on him, including resurrecting horrific memories of his service in Vietnam—namely, numerous firefights where he lost many of his dear friends. Cole's wife (another class member) explained her husband's PTSD was so traumatic, she felt forced to remove their protective guns from their home to prevent him from attempting suicide.

133.    The other veterans and class members who met with club officials also explained their PTSD and the crippling effect every shotgun blast had on them over the ten hours of weekend shooting.

134.    But the club officials dismissed the veterans' suffering because only two of them had engaged in combat, despite the established statistic that more than half of the twenty daily veteran suicides in America involve a veteran who did not see combat.

135.    Even more heartless was KCC's response to class members Don and Pat Lewis, whose home is less than 1,000 yards from the range. About four years ago, Don was terminally ill with cancer. Doctors recommended he spend his final weeks at a hospice center, but he declined. He wanted to die in the home he'd built with his own hands fifty years ago.

136.    Pat, a retired thirty-six-year kindergarten teacher and official with the Lake County historical society, approached KCC. She explained how the gunshots were torturing her husband. KCC officials responded that Pat should take him someplace else on the weekends. When she said he was immobile and suffering terribly, the officials told her, "that's not our problem." So during Don's final weeks, KCC blasted round after round every weekend.

137.    These are merely a few examples of KCC's cruel insensitivity, consistent with the harsh dismissal issued by KCC member Rodney Howell who, like his fellow members, was aware of the physical and psychological trauma the gunshot blasts caused Plaintiffs and class members:

25

> [T]he noise produced by the sporting events is well below the noise level required by law. Additionally, we are only shooting two days per week, 6 hours on Saturday and 4 hours on Sunday. Knowing the shooting schedule should help individuals that may have issues with the noise to pursue other options during this time.

Exhibit I.

138.     Many residents, including Plaintiffs, physically or psychologically lack other options and should not be required to leave their homes.

139.     But the *Szuch* court ruled the "noise level required by law" that Howell described is meaningless where the methodology for testing decibel levels of intermittent shotgun blasts was inaccurate and the decibel ceiling was unattainable. *Id.*, 2016-Ohio-620 at ¶ 28.

140.     Accordingly, Plaintiff and class members should *not* be forced to relocate during the shooting; instead, KCC's and the John Doe Defendants' shooting is illegal and should stop.

**K.      The effect of Defendants' incessant shooting has been disastrous on Plaintiffs and their family.**

141.     Plaintiffs live less than 5,000 feet from KCC's shooting range.

142.     The noise from the shooting is so loud they boarded up their chimney, but it didn't help.

143.     The noise ruins every weekend and raises the anxiety of Plaintiffs and their two children, resulting in agitation and fighting.

144.     There's no reprieve from the unpredictable shooting, putting Plaintiffs perpetually on edge.

145.     The noise prevents any rest or peace, even resulting in Plaintiffs' dogs constantly barking.

146.    Not only to Plaintiffs' pray for the end of every weekend, but they dread every weekends' arrival.

147.    But worst of all, Michon receives chemotherapy every three weeks. It saps her strength for that week and requires her to stay at home afterward. But because of the constant shooting, she can't rest peacefully during her recovery. Instead, she lies in the noisy dark praying for her recovery to end.

148.    Finally, during COVID, the noise was especially devastating because Plaintiffs and their children literally couldn't escape their home.

## **CLASS-ACTION ALLEGATIONS**

149.    Plaintiff brings this lawsuit under Rules 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure on behalf of the following class:

> All people who live or lived within a 4.75-mile radius of KCC from November 2015 to present.

> Excluded from the class are (1) class counsel, (2) business entities, (3) defense counsel, and (4) any judicial officer who considers or renders a decision or ruling in this case.

150.    From at least November 2015 to present, Plaintiffs have lived within a 4.75-mile radius of KCC. Therefore, they are class members.

151.    Class members are identifiable from a topographical map of a 4.75-mile radius of KCC as well as from public records. Therefore, the class is ascertainable.

152.    Several hundred or thousands of geographically dispersed people comprise the class, meaning it so numerous that joinder of all members is impracticable.

153.    Common legal and factual questions, susceptible to common answers, exist among all class members, including but not limited to:

27

    a.    Whether Defendants denied class members procedural due process with respect to receiving notice of Willoughby's meetings relating to the CUP;

    b.    Whether Defendants misrepresented the decibel levels ascribable to KCC's shooting;

    c.    Whether Defendants lied about abatement measures;

    d.    Whether Defendants' shooting constitutes a public nuisance;

    e.    Whether Defendants' shooting constitutes a private nuisance;

    f.    Whether Defendants' shooting constitutes an absolute nuisance (nuisance per se);

    g.    Whether Defendants' shooting constitutes a qualified nuisance;

    h.    Whether Defendants' shooting constitutes negligence;

    i.    Whether Chairman Merhar, Fiala, and Kary conspired to improperly approve KCC's CUP;

    j.    Whether Plaintiffs and the class are entitled to injunctive relief because of Defendants' shooting; and

    k.    Whether Plaintiffs and the class are entitled to declaratory relief because of Defendants' shooting.

154.    Plaintiffs' claims are typical of class members' claims, and Plaintiffs will fairly and adequately represent class members' interests.

155.    Plaintiffs' attorneys are experienced and competent in class-action litigation and will competently and adequately represent class members' interests.

156.    Defendants have acted or refused to act on grounds generally applicable to the class thereby making final injunctive relief or corresponding declaratory relief with respect to the class appropriate.

157.    The preceding common factual and legal questions predominate over any questions affecting individual class members.

158. Class certification is superior to any other method or procedure for fairly and efficiently adjudicating Plaintiffs' and class members' claims because:

      a.    It provides economies for the Court and allows the parties to litigate the common issues on a classwide basis instead of on a repetitive, individual basis;

      b.    Each class member's damage claim is too small to make individual litigation an economically viable possibility for which reason few if any class members are likely to have an interest in individually controlling the prosecution of separate actions;

      c.    Despite the relatively small size of each class member's claim, the aggregate volume of their claims—coupled with the economies of scale inherent in litigating similar claims on a common basis—will enable class counsel to litigate the case on a cost-effective basis; and

      d.    Class treatment is required for optimal deterrence and for limiting the reasonable legal expenses incurred by class members.

159. Plaintiffs anticipate no unusual difficulties in managing and maintaining this case as a class action.

160. Class certification is appropriate under Rule 23(b)(2) because Defendants acted on grounds generally applicable to Plaintiffs and class members all of whom are at imminent risk of irreparable harm from Defendants' continued shooting. Thus, Plaintiffs and class members are entitled to final injunctive relief as well as declaratory relief that establishes their rights and Defendants' duties with respect Defendants' misconduct.

161. Certification under Rule 23(c)(4) concerning Defendants' liability is appropriate in this action brought or maintained as a class action with respect to particular issues.

**COUNT I**
**Violation of 42 U.S.C. § 1983 for Denial of Procedural Due Process**
**Under the Fourteenth Amendment**
**(Against Willoughby)**

162.    Plaintiffs and class members reallege and incorporate by reference every allegation set forth above as if rewritten here.

163.    The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

164.    Plaintiffs and class members have a property right known as an intangible interest in their premises—*to wit*, the right to acquire, use, and enjoy their property.

165.    The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.

166.    Willoughby failed to provide or failed to adequately provide Plaintiffs and class members notice reasonably calculated under all circumstances to apprise them, as interested parties, of the pendency of the hearing and meeting involving KCC's CUP to afford them an opportunity to present their objections.

167.    By failing to notify or adequately notify Plaintiffs and class members of the hearing and meeting where Willoughby, through Chairman Merhar, Fiala, and Kary acting under color of state law, deprived Plaintiffs and class members of a federal right, Willoughby illegally commenced the process for awarding, and awarded, KCC its CUP, thereby depriving Plaintiffs and class members of their intangible property interest protected by the Due Process Clause of the Fourteenth Amendment.

168.    In this manner, Willoughby adopted, exercised, and advanced repeatedly an unofficial or official custom of failing to provide notice or providing inadequate notice to Plaintiffs

and class members where their due process rights involving their protected and intangible property interests were concerned.

169.    As the proximate result of Willoughby's violation of Plaintiffs' and class members' procedural due process rights, they have suffered damages and are entitled to injunctive relief and money damages.

### COUNT II
**Violation of 42 U.S.C. § 1983 for Denial of Procedural Due Process**
**Under the Fourteenth Amendment**
**(Against KCC and John Does 1–100)**

170.    Plaintiffs and class members reallege and incorporate by reference every allegation set forth above as if rewritten here.

171.    The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

172.    Nongovernment actors must comply with constitutional commands where there is such a close nexus between the governmental defendant and the challenged action that seemingly private behavior may be fairly treated as that of the governmental defendant.

173.    KCC's and the John Doe Defendants' influence over Willoughby demonstrates a deep and symbiotic relationship between KCC and the John Doe Defendants and Willoughby.

174.    The facts demonstrating this relationship plausibly establish KCC's and the John Doe Defendants' state-actor status because KCC's and the John Doe Defendants' conduct was fairly attributable to Willoughby.

175.    Accordingly, KCC and the John Doe Defendants were governmental actors for purposes of liability under 42 U.S.C. § 1983.

176.     The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.

177.     KCC and the John Doe Defendants were complicit in Willoughby's failure to provide or failure to adequately provide Plaintiffs and class members notice reasonably calculated under all circumstances to apprise them, as interested parties, of the pendency of Willoughby's and the John Doe Defendants' hearing and meeting involving KCC's CUP to afford them an opportunity to present their objections.

178.     By such complicity, KCC and the John Doe Defendants deprived Plaintiffs and class members of a federal right—namely, their intangible property interest protected by the Due Process Clause of the Fourteenth Amendment.

179.     As the proximate result of KCC's and the John Doe Defendants' violation of Plaintiffs' and class members' procedural due process rights, they have suffered damages and are entitled to injunctive relief and money damages.

**COUNT III**
**Violation of 42 U.S.C § 1985 for Conspiracy to Interfere with Civil Rights**
**(Against Chairman Merhar, Fiala, and Kary)**

180.     Plaintiffs and class members reallege and incorporate by reference every allegation set forth above as if rewritten here.

181.     By facilitating and supporting the issuance of KCC's CUP based on flawed data, a conspiracy exited where Chairman Merhar, Fiala, and Kary acted outside the scope of their employment by Willoughby or for personal reasons.

182.     In granting KCC's CUP based on flawed data, Chairman Merhar, Fiala, and Kary caused to be done an act in furtherance of the object of their conspiracy, whereby Plaintiffs and class members were injured in their person or property or were deprived of having and exercising

32

certain rights or privileges as United States citizens, thus providing them an action for the recovery of damages against Chairman Merhar, Fiala, and Kary.

183.     Chairman Merhar, Fiala, and Kary's conduct violated clearly established constitutional rights because a reasonable person would have known that such conduct was unconstitutional.

184.     As the proximate result of Chairman Merhar, Fiala, and Kary's conspiracy, Plaintiffs and class members have suffered damages and are entitled to money damages for which Chairman Merhar, Fiala, and Kary are jointly and severally liable.

**COUNT IV**
**Declaratory Relief Under 28 U.S.C. § 2201**
**(Against All Defendants)**

185.     Plaintiffs and class members reallege and incorporate by reference every allegation set forth above as if rewritten here.

186.     A genuine, ripe, and concrete controversy exists between Defendants on the one hand and Plaintiffs and class members on the other hand concerning Defendant's wrongful and illegal behavior such that this Court may declare the rights and other legal relations of any interested party seeking such declaration.

187.     This controversy is justiciable in character. Defendants have engaged in and continue to engage in illegal conduct related to KCC's shooting range and Willoughby, Chairman Merhar, Fiala, and Kary approval thereof.

188.     Speedy relief is necessary to preserve Plaintiffs' and class members' rights that might be otherwise impaired or lost because Defendants have committed and will continue to commit acts that will produce direct, immediate, and irreparable harm.

189.     Plaintiffs and class members have no plain, speedy, or adequate remedy at law.

190. The foregoing facts show that a substantial controversy exists between parties having adverse legal interests of sufficient immediacy and reality to warrant final declaratory relief.

191. Under 28 U.S.C. § 2201, the Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

192. Plaintiffs and class members seek a declaration of the rights, status, and contractual obligations and entitlements of the parties under the law supporting the preceding claims. By granting the requested declaratory relief, the Court will avoid multiple actions by declaring the litigants' rights and obligations in one action.

193. Plaintiffs and class members request that the Court declare Willoughby, Chairman Merhar, Fiala, Kary, and KCC violated Plaintiffs' and class members' rights to the entitlement of procedural due process and/or conspired against them in so doing, and declare KCC and the John Doe Defendants are engaged in illegal shooting.

## COUNT V
### Public Nuisance
### (Against KCC and John Does 1–100)

194. Plaintiffs and class members reallege and incorporate by reference every allegation set forth above as if rewritten here.

195. KCC's and the John Doe Defendants' conduct as alleged herein is an unreasonable interference with a right common to the general public.

196. KCC's and the John Doe Defendants' unreasonable interference with a right common to the general public as alleged herein significantly interferes with the public health,

34

safety, peace, comfort, or convenience; is conduct that is contrary to a statute, ordinance, or regulation; or is conduct that is of a continuing nature or has produced a permanent or long-lasting effect upon the public right—an effect of which KCC and the John Doe Defendants should be aware.

197.     KCC's and the John Doe Defendants' unreasonable interference with a right common to the general public as alleged herein has affected a public right.

198.     KCC's and the John Doe Defendants' have interfered with a public right, and Plaintiffs and class members have suffered an injury distinct from that suffered by the public as large.

199.     KCC's and the John Doe Defendants' conduct as alleged herein was intentional or negligent.

200.     As the proximate result of KCC's and the John Doe Defendants' public nuisance, Plaintiffs and class members have suffered damages and are entitled to injunctive relief and money damages.

## COUNT VI
### Private Nuisance
### (Against KCC and John Does 1–100)

201.     Plaintiffs and class members reallege and incorporate by reference every allegation set forth above as if rewritten here.

202.     By KCC's and the John Doe Defendants 'conduct as alleged herein, they committed a nontrespassory invasion of Plaintiffs' and class members' interests in the private use and enjoyment of their land.

203.     KCC's and the John Doe Defendants' conduct as alleged herein was intentional or unreasonable or unintentional but caused by negligent, reckless, or abnormally dangerous conduct.

35

204. KCC's and the John Doe Defendants' conduct as alleged herein was intentional or negligent.

205. As the proximate result of KCC's and the John Doe Defendants' private nuisance, Plaintiffs and class members have suffered damages and are entitled to injunctive relief and money damages.

**COUNT VII**
**Absolute Nuisance (Nuisance Per Se)**
**(Against KCC and John Does 1–100)**

206. Plaintiffs and class members reallege and incorporate by reference every allegation set forth above as if rewritten here.

207. KCC's and the John Doe Defendants' conduct as alleged herein was intentional or negligent.

208. KCC's and the John Doe Defendants' conduct as alleged herein constituted a culpable and intentional act resulting in harm, an act involving culpable and unlawful conduct causing unintentional harm, or a nonculpable act resulting in accidental harm for which, because of the hazard involved, absolute liability attaches notwithstanding the potential (but unlikely) absence of fault.

209. KCC's and the John Doe Defendants' used their property for activities that are unreasonably hazardous where no matter how careful KCC's and the John Doe Defendants' were, such activities are inherently injurious and cannot be conducted without damaging Plaintiffs' and class members' property or rights.

210. As the proximate result of KCC's and the John Doe Defendants' absolute nuisance, Plaintiffs and class members have suffered damages and are entitled to injunctive relief and money damages.

## COUNT XIII
### Qualified Nuisance
### (Against KCC and John Does 1–100)

211.     Plaintiffs and class members reallege and incorporate by reference every allegation set forth above as if rewritten here.

212.     KCC's and the John Doe Defendants' conduct as alleged herein was intentional or negligent.

213.     By KCC's and the John Doe Defendants' conduct as alleged herein, KCC's and the John Doe Defendants' acted so negligently or carelessly as to create a potential and unreasonable risk of harm that in due course resulted in Plaintiffs' and class members' injuries.

214.     KCC's and the John Doe Defendants' qualified nuisance arose from their failure to exercise due care where even that which was potentially lawful in origin became a nuisance through KCC's and the John Doe Defendants' negligence in maintenance.

215.     As the proximate result of KCC's and the John Doe Defendants' qualified nuisance, Plaintiffs and class members have suffered damages and are entitled to injunctive relief and money damages.

## COUNT IX
### Negligence
### (Against KCC and John Does 1–100)

216.     Plaintiffs and class members reallege and incorporate by reference every allegation set forth above as if rewritten here.

217.     KCC and the John Doe Defendants owed Plaintiffs and class members a duty to act with reasonable care as it concerns designing, operating, seeking approval to maintain, and/or participating at KCC's shooting range.

218.     By violating Ohio's decibel-level requirements in seeking and maintaining KCC's shooting range, KCC and the John Doe Defendants breached their duty owed to Plaintiff and class members—to wit, they failed to exercise reasonable care in designing, operating, seeking approval to maintain, and/or participating at KCC's shooting range.

219.     As the proximate result of KCC's and the John Doe Defendants' breach of their duty owed to Plaintiffs and class members (i.e., KCC's and the John Doe Defendants' negligence), Plaintiffs and class members have suffered money damages.

## COUNT X
### Injunctive Relief
### (Against KCC and John Does 1–100)

220.     Plaintiffs and class members reallege and incorporate by reference every allegation set forth above as if rewritten here.

221.     Plaintiffs and class members are substantially likely to prevail on the merits because of the acts alleged herein against KCC and the John Doe Defendants.

222.     Plaintiffs and class members will suffer irreparable injury if the Court does not enjoin KCC's and the John Doe Defendants' misconduct, including the imposition of a constructive trust as it concerns any money owed to Plaintiff and class members.

223.     If the Court does not enjoin KCC's and the John Doe Defendants' continuing misconduct or impose a constructive trust, the harm to Plaintiffs and class members would clearly outweigh any potential harm to KCC and the John Doe Defendants from enjoining their misconduct.

224.     No third parties will be harmed by granting the requested injunctive relief.

225.     The requested injunctive relief will serve the public interest because it will prevent KCC and the John Doe Defendants from continuing to harm Plaintiff and class members.

226.    A preliminary and permanent injunction is needed to prevent the irreparable harm KCC and the John Doe Defendants will cause Plaintiffs and class members by maintaining their illegal behavior.

227.    Plaintiffs and class members lack a plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiffs and class members demand judgment in their favor and against Defendants jointly and severally (as to money damages, where appropriate) as follows:

1.    With respect to Count I, an order awarding injunctive relief and money damages;

2.    With respect to Count II, an order awarding injunctive relief and money damages;

3.    With respect to Count III, an order awarding injunctive relief and money damages;

4.    With respect to Count IV, a declaration that Willoughby, Chairman Merhar, Fiala, Kary, and KCC violated Plaintiffs' and class members' rights to the entitlement of procedural due process and/or conspired against them in so doing, and KCC and the John Doe Defendants are engaged in illegal shooting;

5.    With respect to Count V, an order awarding injunctive relief and money damages;

6.    With respect to Count VI, an order awarding injunctive relief and money damages;

7.    With respect to Count VII, an order awarding injunctive relief and money damages;

8.    With respect to Count VIII, an order awarding injunctive relief and money damages;

9.    With respect to Count IX, an order awarding money damages;

10. With respect to Count X, an order barring Defendants from shooting until KCC reconfigures or moves its range or installs safeguards to ensure suitable decibel levels or otherwise repatterns or moves KCC's range sufficient to stem its destructive effect on Plaintiffs and class members and money damages;

11. Pre-judgment interest at the maximum rate on all amounts owed to Plaintiffs and class members and post-judgment interest from and after the date of judgment at the maximum rate allowed by law;

12. The costs of this action, including reasonable attorneys' fees;

13. An order certifying the class as pleaded and appointing Plaintiffs as class representative and Plaintiffs' counsel as class counsel; and

14. Such other and further relief as this Court may deem just and proper.

Dated: December 17, 2023

Respectfully submitted,

*s/Tim Misny*
Tim Misny (00005114)
**THE LAW OFFICE OF TIM MISNY**
3100 E. 45th St., Suite 444
Cleveland, Ohio 44127
(855) 655-8651
tmisny@misnylaw.com

Daniel R. Karon (0069304)
**KARON LLC**
700 West St. Clair Ave., Suite 200
Cleveland, Ohio 44113
(216) 622-1851
dkaron@karonllc.com

*Attorneys for Plaintiffs and the class*

## JURY DEMAND

According to Fed. R. Civ. P. 38, Plaintiffs and class members demand a jury trial on all triable issues.

*s/Tim Misny*
Tim Misny